## THE RADNOR (two cases).

(Circuit Court of Appeals, Fourth Circuit.
June 8, 1926.)

Nos. 2447, 2448.

Towage ⬤➡11(7).

Steam tug *held* solely responsible for collision occurring when it permitted tow to drift within tow's length of railroad drawbridge, after receiving no answer to its signals to pass, under Regulations of Engineers' Office of War Department, §§ 1, 2, particularly in view of failure to give proper danger signals and to reverse engines.

Appeals from the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Libel by the Union Acid Works, Inc., against the steam tug Radnor, wherein the Baltimore & Ohio Railroad Company was interpleaded, under admiralty rule 56, at the instance of the tug, and suit by Robert E. L. Freburger, master of the steam tug Radnor, against the Baltimore & Ohio Railroad Company, tried together, and by stipulation

heard together on appeal. Decree for libelant in the first case, and for defendant in the latter case, and Robert E. L. Freburger, master of the steam tug Radnor, appeals in each case. Affirmed.

The "chart" referred to in the opinion is hereto appended, as follows:

Before WADDILL, ROSE, and PARKER, Circuit Judges.

J. Craig McLanahan, of Baltimore, Md. (France, McLanahan & Rouzer, of Baltimore, Md., on the brief), for appellant.

George Forbes and Duncan K. Brent, both of Baltimore, Md. (Henry L. Wortche

and Allen S. Bowie, both of Baltimore, Md., on the brief), for appellees.

WADDILL, Circuit Judge. These are appeals from a decree of the United States District Court for the District of Maryland, entered on the 2d of July, 1925. The causes involve the question of whether the Union Acid Works, Incorporated, the steam tug Radnor, or the Baltimore & Ohio Railroad Company should bear the losses sustained by barge No. 26 of the said Union Acid Works, and the said tug, when the barge, while in tow of the tug Radnor, came into collision with the drawbridge of the railroad company spanning the Schuylkill river at the city of Philadelphia. The causes were tried together in the District Court, and by stipulation heard together in this court. No. 2447 was a libel filed originally by the Union Acid Works, owner of Barge 26, against the tug Radnor, to recover damages alleged to have been sustained by the barge by reason of the collision aforesaid. The Baltimore & Ohio Railroad Company was impleaded and brought in under admiralty rule 56, at the instance of the tug. No. 2448 was an independent suit filed by the master of the tug against the railroad company, owner of the drawbridge, for damages sustained by the tug as a result of the collision.

The District Court found the tug solely at fault for bringing about the collision, and that the Baltimore & Ohio Railroad Company was free from negligence, and accordingly decreed that the master and claimant of the tug, or the Fidelity & Deposit Company, stipulator for the release of said tug, pay to the Union Acid Works the amount of damages sustained by it, with interest and costs; that the petition bringing in the railroad company, and the independent suit, No. 2448, against said railroad company, should be dismissed with costs. From this decree the appeals in the two causes were taken, and will be disposed of in one opinion here. The facts are briefly these:

The Union Acid Works engaged the steam tug Radnor to tow its barge No. 26, with a cargo of approximately 400 tons of oleum thereon, from the Du Pont pier, on the Schuylkill river at Philadelphia, to Baltimore. On the morning of the 12th of March, 1924, between 6 and 6:05 a. m., the tug took the barge in tow at the Du Pont pier (shown on the chart as Harrison's wharf), and proceeded with the same down the river, passing through the draw at Gray's Ferry highway bridge in about four or five minutes, and, upon reaching the Pennsylvania Railroad bridge (shown on the chart as Gray's Ferry railroad bridge), some 200 feet south of the first-named bridge, passed safely through the draw of that bridge, having, however, to wait some time, perhaps 15 or 20 minutes, on account of obstruction at the draw. The drawbridge of the Baltimore & Ohio Railroad Company is approximately 1,900 feet south of the Pennsylvania Railroad bridge, through the draw of which the tug and tow had also to pass, and, as a consequence of the inability so to do, and from the incidents arising in connection therewith, the collision, the subject of this litigation, occurred. The freedom from fault of the libelant's barge No. 26 is conceded, leaving for determination only the question of whether the tug or the Baltimore & Ohio Railroad Company was at fault, or whether they were both guilty of negligence in bringing about the collision, and should be jointly held liable therefor. A correct understanding of the governmental regulations under which the drawbridge was operated, and the signals required to be given, is necessary to intelligently judge of the conduct, as well of those navigating the tug and tow, as of those in control of the drawbridge, at the time of and immediately preceding the collision.

Sections 1 and 2 of the Regulations of the Engineers' Office of the United States War Department, duly promulgated by the Secretary of War, are as follows:

"1. *Signals.*—When at any time during the day or night any vessel, tug, or other water craft unable to pass under the bridge, approaches it with the intention of passing through the draw, the signal for the draw to be opened shall be three blasts of a whistle or horn blown on the vessel or craft.

"If the draw is ready to be opened immediately when the signal is given on the vessel or craft, the signal shall be answered immediately by two blasts of a whistle or horn blown on the bridge; and if the draw is not ready to be opened immediately on the signal being given on the craft, the signal shall be answered immediately by one blast of a whistle or horn blown on the bridge.

"2. *Opening the Draw.*—Upon hearing or perceiving the prescribed signal, the bridge tender shall immediately clear the draw span and open the draw to its full extent for the passage of the vessel or other craft: Provided, that the draw of a railroad bridge need not be opened when there is a train in the bridge block approaching the bridge with the intention of crossing, nor within 5 minutes of the known time of passage of a scheduled passenger, mail or express train; but in

no event, except in case of breakdown of the operating machinery, shall the opening of the draw be delayed more than 5 minutes in the case of a highway bridge, nor more than 10 minutes in the case of a railroad bridge. * * * "

That there was some confusion, arising, doubtless, from the failure to hear the prescribed signals, required to be given under these rules, by the tow and the manager of the draw, respectively, seems quite evident; but upon whom the result thereof, and the consequent losses, should fall, is a more difficult question to determine, and one that can be solved only upon a full consideration of the testimony in the light of all the facts and circumstances surrounding the accident.

Considering, first, the duty of the manager of the draw: Upon receiving a signal of three blasts of the whistle or horn from the tow, indicating its intention to pass through the draw, if the same was ready to be opened, he should have immediately answered, sounding two blasts of his whistle or horn, indicating that the way was clear and that the draw would be opened; and, if the draw was not ready to be opened, an answer of one blast of the whistle or horn from the bridge should have been immediately given, indicating that the draw would not be opened.

The bridge tender insisted that this signal of one blast of the whistle or horn was given immediately upon hearing three blasts of the tow's whistle, indicating its desire to pass through the draw, and that the signal of three blasts of the tow's whistle was heard only once, to which the response of one blast of its whistle was immediately given, as aforesaid, indicating that the draw was closed. The bridge tender says that the reason for not opening the draw was that there was a train in the bridge block, approaching the bridge with the intention of crossing; that, moreover, it was within five minutes of the time of the passage of a scheduled passenger, mail, and express train; that his obvious duty forbade his throwing open the draw in such circumstances; and that he would have been justified, if it had become necessary, in keeping the draw closed for a full ten minutes.

The District Court found that the facts supported the version of the bridge tender and the contention of the railroad, that the bridge tender was warranted and justified in not opening the draw, and that hence the railroad company was free from fault. With these findings and conclusions of the trial court we are in full accord.

The tug and tow, from its own showing, cannot escape liability for the collision. Upon passing through the Pennsylvania Railroad draw, it sounded the appropriate signal of three blasts of its whistle, indicating its purpose to pass through the Baltimore & Ohio Railroad draw, and, receiving no reply to its request for passage, quickly repeated its signals indicating its desire to pass, to which, likewise, no reply was received, and thereupon continued down the river, drifting with the wind and tide, until within some 165 feet, about the length of the barge, of the bridge, when it gave eight blasts of its whistle as danger signals, but to these no response from the bridge was made, and the barge quickly came into collision with the bridge, sustaining the damages sued for. The tow was thus necessarily placed in a position of peril, as there was no way to avoid colliding with the bridge save to ground the barge, which was not deemed the proper course to pursue.

The distance between the two railroad bridges was some 1,900 feet, a third of a mile. It was within the harbor; there was nothing in the waters, surroundings, or the condition of the weather, wind, or tide that made it an especially hazardous undertaking to take this tow, in the broad daytime, down the river and through the draws constructed for the purpose, with comparative safety. Of course, promptness and good seamanship were required to avoid unnecessary risks incident to the undertaking. Immediately upon the tug's failure to receive a reply of two whistles to its three whistles requesting passage through the draw, it was admonished that it was proceeding, with the draw closed, into a position of imminent danger; and when apparently a second request of three whistles was promptly sounded, with no response, the situation became more acute, as the tow was again warned that the draw was closed, and that no permission to pass had been secured. The danger from such situation was accentuated, and became more serious each moment, as the time was comparatively short within which the collision must occur, unless the tug and tow discontinued their progress down the river.

To have waited under these circumstances until within a barge length of the bridge, with the draw closed, without giving danger signals earlier, or at least stopping, reversing, and putting its engines full speed astern, was manifest negligence. Anything done at that time was too late to prevent the accident. The bridge tender could not then have done anything, assuming the danger signals to have been heard, to change the conditions

that would not probably have increased the hazards generally, and of course to stop, reverse, and back the tug's engines at that time was too late to materially affect the tow's headway in time to avoid the collision. Assuming the tug to have been seaworthy and suited for the undertaking—and nothing appears to the contrary—there was no reason why the tow could not have been safely taken down the river, having, of course, regard to the necessity of passing through the draws, though the tug's master insists that navigation was rendered difficult by the strong downstream breeze. The two bridges were a third of a mile apart, and there was no sufficient excuse for the tug's navigating to within a barge length of the lower bridge without knowing whether the draw was to be opened or not, nor should it have omitted taking timely precautions to keep its tow under control.

The decision of the lower court, holding the tug solely responsible for the collision, is clearly right, and its decree appealed from, so holding, and otherwise disposing of the two cases, should be approved and affirmed, with costs.

Affirmed.